### YOUNG v. WOODWARD IRON CO. et al.
#### (6 Div. 456.)

Supreme Court of Alabama.    March 24, 1927.

Rehearing Denied June 2, 1927.

**1. Railroads** ☞297(2)—**Burden was on plaintiff to show defendant's trainmen discovered peril in time to have averted collision with another train at crossing.**

In action against railroad for death of engineer on another road resulting from crossing collision, burden was on plaintiff to show that defendant's servants discovered deceased's condition of peril in time to have warned him or to have prevented accident, under allegations charging subsequent negligence.

**2. Railroads** ☞288—**Engineer on train proceeding over crossing had right to presume engineer on approaching train would stop (Code 1923, §§ 5330, 9953).**

Engineer on train proceeding over crossing had right to presume that engineer on approaching train was familiar with locality of crossing and would comply with law by approaching under control and coming to full stop, and that he would not proceed until he knew way was clear, as required by Code 1923, §§ 5330, 9953, an action for death of engineer on approaching train.

**3. Railroads** ☞297(2)—**Burden to prove crossing is exempt from rule requiring trains to stop is on party claiming exception (Code 1923, § 9953).**

Burden of proof that railroad crossing is equipped with safety devices, within exception of Code 1923, § 9953, requiring trains to come to full stop before proceeding to cross, is on party who claims to come within exception.

**4. Railroads** ☞295—**Failure of engineer in fog to control train so as to enable stopping within visible range of headlights was gross negligence.**

Engineer's omission of duty to keep train under such control as to enable stopping within visible range of headlights was gross negligence, where vision was restricted by fog.

**5. Railroads** ☞295—**Engineer's duty to proceed cautiously under conditions restricting vision is unaffected by opinions of witnesses.**

Duty of engineer, imposed by law, under conditions restricting vision, to proceed with great caution, is unaffected by opinions of witnesses.

**6. Negligence** ☞83—**Actual "knowledge of peril" is required to prove subsequent negligence.**

Knowledge of peril essential to show guilt of subsequent negligence means actual knowledge, not imputed knowledge based on information merely of facts which, if followed up, would result in actual knowledge.

**7. Railroads** ☞297(7)—**Evidence held insufficient to make issue of subsequent negligence as to engineer colliding with defendant's train occupying crossing.**

In action against railroad and engineer on train proceeding over crossing for death of engineer, who approached crossing in dense fog without stopping and collided with defendant's train, evidence held insufficient to make issue for jury on question of subsequent negligence.

**8. Railroads** ☞297(7)—**Evidence engineer, seeing reflection of headlight from deceased's train, failed to blow whistle, held insufficient to make issue of subsequent negligence.**

In action against engineer and railroad for death of engineer on another train colliding with defendant's train at crossing, evidence that defendant engineer saw reflection of deceased's headlight and reached for whistle cord, but failed to blow whistle, held insufficient to make issue of engineer's subsequent negligence for jury.

**9. New trial** ☞103—**Newly discovered evidence of admission of engineer occupying crossing that, but for his failure to blow whistle after seeing approaching train, accident would not have happened, held material, requiring new trial against engineer.**

In action against railroad and engineer for death at crossing collision, newly discovered evidence that engineer admitted seeing other train, and that, but for his failure to blow whistle, accident would not have happened, held material, requiring new trial, as against engineer.

**10. New trial** ☞104(3)—**Evidence of engineer's admission that failure to signal on knowing approach of other train to crossing caused accident held not merely cumulative, in action for death.**

In action for death of engineer at railroad crossing, newly discovered evidence of defendant engineer's admission that his failure to blow cord after seeing train caused accident held not merely cumulative of evidence tending to show that he had been warned of train's approach.

#### On Rehearing.

**11. New trial** ☞8—**Newly discovered evidence of engineer's admission, in action for death, warranted new trial against engineer alone, though judgment was entered in favor of engineer and railroad jointly.**

In action against railroad and engineer for death at crossing, in which joint judgment was entered in favor of both defendants, new trial could nevertheless be granted, as against engineer alone, on basis of newly discovered evidence of admission.

**12. Appeal and error** ☞1173(1)—**Judgment in favor of several defendants jointly may be reversed as to some and affirmed as to others.**

Rule that joint judgment against several defendants is entirety, so that reversal as to one requires reversal as to all, does not apply to judgments in favor of joint defendants, where reason and justice of case do not demand such treatment.

**13. New trial** ☞8—**New trial may be granted as to one of several defendants, sued in tort, without affecting others, on discovery of new evidence admissible against one alone.**

In case of newly discovered evidence, admissible as against only one of joint tort-feasors, judgment may be set aside, and new trial grant-

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ed as to one of defendants, and allowed to stand as to others.

Appeal from Circuit Court, Jefferson County; Roger Snyder, Judge.

Action for damages for wrongful death by Mrs. J. L. Young, as administratrix of the estate of J. L. Young, deceased, against the Tennessee Coal, Iron & Railroad Company, the Birmingham Southern Railroad Company, the Woodward Iron Company, and M. H. Giles. From a judgment for defendants, plaintiff appeals. Affirmed in part, and reversed, rendered, and remanded in part.

The plaintiff's intestate, a locomotive engineer operating an engine and passenger train on the Alabama Great Southern Railroad, ran his engine and train into a train of freight cars at a railroad crossing, and was killed. The freight train belonged to the defendant Tennessee Coal, Iron & Railroad Company, and the engine was operated by the defendant M. H. Giles, locomotive engineer. The Woodward Iron Company and the Birmingham Southern Railroad Company were also made parties defendant.

The complaint is in three counts: For simple initial negligence, subsequent negligence, and wanton or willful injury, respectively. All of them charge that the intestate's death was caused by the negligence or wanton misconduct of "defendant's servants or agents." The general affirmative charge was given for the two defendants last named, and the plaintiff withdrew counts 1 and 3, leaving only the count for subsequent negligence to be submitted to the jury, and on that count the trial was had, and the verdict and judgment rendered.

The following facts are undisputed: About 1 o'clock a. m. defendant's train approaching the Alabama Great Southern Railroad crossing, came to a stop, blew twice, and then proceeded to cross. It was a train of 31 empty ore cars, besides the engine and tender. Twenty-one cars had gotten over the crossing when the Alabama Great Southern train, driven by the intestate as engineer, and running from east to west at a speed of 25 or 30 miles an hour, crashed into defendant's train, without having stopped or slowed down for the crossing. Defendant's train had been on the crossing about 2½ to 3 minutes when the crash occurred, the engine, on which were the engineer, fireman and conductor, being then about 670 feet beyond the crossing. A switchman, Will Mitchell, had preceded his train over the crossing on foot and was at the Woodward Junction switch, about 30 feet beyond the engine, when he saw the lights in the coach windows of the approaching Alabama Great Southern train, and heard its engine working steam. There was a heavy fog over everything at the time, so dense that an engine's headlight would disclose objects only two or three car lengths ahead. The in-

testate was an old engineer and thoroughly acquainted with the track at this crossing. The Lipscomb dirt road crossing over the Alabama Great Southern track was about a quarter of a mile east of the Woodward crossing where the collision occurred.

Will Mitchell, defendant's switchmen, testified for plaintiff as follows:

"As he (defendant's train) came on to me while I was up here at Woodward Junction switch, I discovered the light from the Alabama Great Southern engine coming over one hill and going down and coming up another hill. I could see his light above the fog, but I couldn't see him when he got on the level, before he got on the (dirt road) crossing. * * * When I first saw the reflection of his headlight in the sky, I was standing on the main line. * * * I discovered it was him away up the track a couple of miles. * * * I knew it was the headlight from an engine coming along the Alabama Great Southern track. * * * I was at the Woodward Junction switch when I saw the lights in the coaches of that passenger train as it approached. * * * It had about crossed that dirt road crossing when I first saw it. * * * The engine wasn't cut off, but was pulling his train. * * * When I saw those lights and heard the engine working steam, Young's train was distant from the defendant's train I will say about 90 feet; maybe 100 feet. * * * When I saw him coming up here about this dirt road crossing and working steam, I left Woodward Junction switch and made it back towards the engine. * * * I started back, * * * and the first thing I did when I started back, I hollered to * * * the fireman on that Tennessee Company's train that I thought that man was going to cut us in two down there, and made it on towards the other end. I was running. * * * I didn't get to the back end of my train * * * before they hit. Neither the fireman nor the engineer did anything at all, or gave any warning to this man as he approached, when I hollered to the fireman. * * * No whistle was blown. * * * Where a train is blocking the crossing on the back end, * * * the warning signal in case of danger is one long blast of the whistle. * * * That signal is used on the Tennessee Company's train as warning under the conditions that existed * * * and also on the Alabama Great Southern Railroad. * * * I did not give any signal to anybody about the train coming. * * * He was away on the other side of the dirt road crossing when I heard him. He kept on going fast all the time * * * until he hit. * * * You couldn't see the headlight. I guess the headlight was burning. * * * It was up hill at Lipscomb, but it is a curve. It was pulling around a curve there at that time."

O. W. Fidler, an experienced engineer, testified that, with the use of sand and the emergency application of brakes, the Alabama Great Southern train could have been stopped within 300 to 350 feet.

F. Aderholt, another experienced engineer, testified that he could stop a train at this crossing, by using sand and emergency, in about 300 yards, and could reduce its speed from 30 to 15 miles an hour in 300 feet.

Defendant's fireman, Muse, testified:

"I did not know the Alabama Great Southern train was approaching. * * * There was nothing said about this train coming. I didn't know, until I was struck, that this train was coming at all. * * * Our engineer could have blown that whistle in a fraction of a second. * * * I did not hear any brakeman holler at me; I was looking straight ahead all the time."

Defendant's conductor, Vardaman, testified:

"I did not hear Will Mitchell, the switchman, say anything about this train coming, before this train hit. I was sitting by the fireman on the fireman's seat. * * * I know when I hear a man working steam that he is not going to stop. * * * There was nothing to keep us from seeing the light of that train as it approached us, except the fog. I didn't have any occasion to look over there; I couldn't have seen it if I had. * * * I don't know if there was anything to keep the engineer from seeing; the fog could have kept him from seeing it. It was not his business to look over that way after he went over that crossing; it was his business to be looking the way he was going."

Defendant's engineer, Giles, testified:

"The first intimation I had of any train coming was a light in the sky. I couldn't tell how far away it was then; there was nothing that I could tell whether he was going to stop or not. I was 4 or 5 car lengths from the crossing when I first saw that light. I was working steam at that time * * * until' I got in a few car lengths of Woodward switch. I did not know at any time that this train was not going to stop before it ran into our train. I did not see the train itself. No one called to me that the train was coming when it ran into me. * * * As I pulled across the crossing I could see the reflection of the headlight in the sky, but I couldn't see the headlight. * * * I wouldn't swear it was the headlight; I knew it was after he hit me. * * * The fog kept me from seeing him, but, if there hadn't been any fog there, I couldn't have seen it on account of the trees. I couldn't see through there hardly at all. I could only have blown a caution signal, if I had known that that train was approaching, to have warned him that my train had blocked that crossing."

W. A. Denson, of Birmingham, for appellant.

It is not necessary for the act of the servant or agent to be anything more than within the line and scope of the employment in order to hold the master or principal liable therefor. Jones v. Strickland, 201 Ala. 140, 77 So. 562; Amer. Ry. Ex. Co. v. Tait, 211 Ala. 350, 100 So. 328; Tucker v. Mobile Inf., 191 Ala. 592, 68 So. 4, L. R. A. 1915D, 1167; So. Ry. v. Wildman, 119 Ala. 570, 24 So. 764. Ordinary care was the degree of care required of plaintiff's intestate to see that the way was clear before proceeding over the crossing. E. & T. H. v. Hoffman, 56 Ind. App. 530, 105 N. E. 788; Id., 67 Ind. App. 571, 118 N. E. 154; L. & N. v. Bowen, 212 Ala. 690, 103 So. 873; 22 R. C. L. 1060; 33 Cyc. 736;

A. G. S. v. Hanbury, 161 Ala. 358, 49 So. 467; Vessel v. S. A. L., 182 Ala. 595, 62 So. 180; 8 A. & E. Ency. L. 357; Coulter v. Ill. Cent., 264 Ill. 414, 106 N. E. 260. The first train has not the right to proceed over the crossing if the circumstances indicate that the other train will not stop. R. & D. R. Co. v. Greenwood, 99 Ala. 515, 14 So. 495; Billingsley v. N. C. & St. L., 177 Ala. 347, 58 So. 433. What constitutes the exercise of due care, or what amounts to negligence, depends upon the circumstances surrounding the person whose conduct is under investigation. H. A. & B. v. Donovan, 94 Ala. 301, 10 So. 139. The duty to stop is not imposed as to all crossings. Code 1923, § 9953. The giving of the affirmative charge for defendants as to the first count was reversible error. Brown v. C. of G., 197 Ala. 71, 72 So. 367; L. & N. v. Calvert, 172 Ala. 600, 55 So. 812; C. of G. v. Foshee, 125 Ala. 217, 27 So. 1006; Wilson v. Windham, 213 Ala. 31, 104 So. 234. The testimony shows defendant Giles to have been aware of intestate's peril in time to have warned him of his peril, and the giving of the affirmative charge as to him was error. L. & N. v. Brown, 121 Ala. 227, 25 So. 609; M., K. & T. v. Settle, 19 Tex. Civ. App. 357, 47 S. W. 825; H. A. & B. v. Swope, 115 Ala. 304, 22 So. 174. The motion for new trial on the ground of newly discovered evidence should have been granted. Fries v. Acme, 201 Ala. 614, 79 So. 45; Kring v. N. Y. Cent. & H. R. R. Co., 45 App. Div. 373, 60 N. Y. S. 1114; Cobb v. Malone, 92 Ala. 630, 9 So. 738.

Percy, Benners & Burr, of Birmingham, for appellees.

The burden is upon the plaintiff to establish all the elements of subsequent negligence. L. & N. v. Moran, 190 Ala. 108, 66 So. 799; A. G. S. v. Smith, 196 Ala. 77, 71 So. 455; Jolley v. Southern R. Co., 197 Ala. 60, 72 So. 382. The proof must show actual discovery of peril. Southern R. Co. v. Drake, 166 Ala. 540, 51 So. 996. It was the positive duty of intestate to stop before proceeding over the crossing, a failure of which constituted the most culpable negligence. Code 1923, §§ 9953, 5330; R. & D. R. Co. v. Freeman, 97 Ala. 289, 11 So. 800; Frese v. C., B. & Q., 263 U. S. 1. 44 S. Ct. 1, 68 L. Ed. 131; Davis v. Kennedy, 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212. And the presence of fog did not excuse his conduct. Ala. Mid. R. Co. v. McGill, 121 Ala. 230, 25 So. 731, 77 Am. St. Rep. 52; West Ry. v. Mitchell, 148 Ala. 35, 41 So. 427. The engineer, Giles, had a right to assume that intestate would comply with the requirements of the law. Southern R. Co. v. Bryan, 125 Ala. 297, 28 So. 445; Southern R. Co. v. Jones, 143 Ala. 328, 39 So. 118; Vessel v. S. A. L., 182 Ala. 589, 62 So. 180. The burden of proof resting on plaintiff, to show that preventive measures could have been taken

after discovery of peril, was not met; the evidence shows that there could not have been time for the switchman, Mitchell, who only gained his knowledge after intestate had passed the point where he was able to stop, to communicate to intestate, through the engineer, Giles, warning of his danger. Newman v. L. & N., 212 Ala. 580, 103 So. 857; Southern R. Co. v. Drake, 166 Ala. 540, 51 So. 996; A. G. S. v. Smith, 196 Ala. 77, 71 So. 455. The burden was upon plaintiff to show that the crossing in question was an exception from the statute. Clark v. State, 19 Ala. 552; Bellinger v. State, 92 Ala. 86, 9 So. 399; Jefferson County v. Gulf Ref. Co., 202 Ala. 510, 80 So. 798. Newly discovered evidence as to what was said by Giles after the accident could only affect the defendant Giles. Such evidence being merely cumulative, and statements made by a party, would not be ground for new trial as against that defendant. McLeod v. Shelly, 108 Ala. 81, 19 So. 326; Wilkinson v. Bottoms, 174 Ala. 122, 56 So. 948; Southern Hdwe. Co. v. Block, 163 Ala. 81, 50 So. 1036; Jones v. Tucker, 132 Ala. 305, 31 So. 21. If reversible error was committed as to any one of the defendants, the reversal as to such defendant would not require a reversal as to all. Pounds v. Richards, 21 Ala. 424; N. A. T. Co. v. Hays, 184 Ala. 592, 64 So. 39; Southern R. Co. v. Harris, 207 Ala. 534, 93 So. 470. The statement of counsel for plaintiff limited the issue to the negligence of Giles. Fayet v. St. L. & S. F., 203 Ala. 3, 81 So. 671.

SOMERVILLE, J. The case was submitted to the jury under the second count of the complaint, charging that defendants' servants or agents, "after becoming aware of the peril of plaintiff's intestate being injured by said collision, negligently failed to use all of the means at their command to avoid said collision, when by the use of said means said collision would have been avoided and intestate's death would have been prevented."

[1] The burden, therefore, was on plaintiff to show that a servant of the defendant corporation, in service on its train on this occasion, discovered that plaintiff's intestate was in peril of a collision, as averred, in time to have warned him of the impending collision, or by other means to have prevented it, and nevertheless, negligently failed to give him such a warning, or to use other available means for its prevention. L. & N. R. Co. v. Moran, 190 Ala. 108, 121, 66 So. 799; L. & N. R. Co. v. Rayburn, 192 Ala. 494, 496, 967, 68 So. 356; B. & A. Ry. Co. v. Campbell, 203 Ala. 296, 300, 82 So. 546.

Counsel for plaintiff stated to the trial judge while he was charging the jury that the defendant corporation could not be found guilty of negligence unless its engineer, Giles, was guilty, and unless the jury found against both defendants they could not find against either. The issue depended, therefore, upon the negligence, vel non, of Giles.

Specifically, the inquiry was: (1) Did Giles discover that the intestate was ignorant of the presence of Giles' train on the crossing, and was not going to stop before he reached the crossing; and (2) if Giles did so discover the situation of intestate, did he then have time, by the use of any available means, to prevent the impending collision, or to avoid its fatal result?

Counsel for plaintiff point to two facts as showing, or tending to show, that Giles had timely knowledge of intestate's peril: (1) His admission that, as he pulled on the crossing, he saw the reflection in the sky from the headlight of the other train, and knew it was approaching on the Alabama Great Southern track; and (2) that he was informed of its approach by the shouting of the switchman Mitchell to the fireman that he "thought that man was going to cut us in two down there."

[2] It must be noted, however, that, when Giles first saw the headlight's reflection, the Alabama Great Southern train must, by any possible estimate based on the evidence, have been more than a mile distant from the crossing. Its speed was, of course, a matter of conjecture, but whatever its speed there was nothing to indicate that its engineer intended to violate his imperative duty, as well as the criminal law, by running over railroad crossings without first stopping his train, nor anything to indicate that he was ignorant of his environment and the presence of a crossing ahead. Counsel for plaintiff argue that Giles knew that the intestate was lost in the fog, and could not see, and, therefore, that he would not stop. But, on the contrary, Giles' train, in the same fog, was not lost, and Giles himself had located the crossing, and brought his train to a full stop, with warning whistles, before proceeding to cross. There was no reason to suppose that the intestate would do anything less. Giles had a right to presume that the engineer of the approaching train was familiar with the locality of the crossing, and the evidence shows that he was in fact *thoroughly* familiar with it. He had a right to further presume that the other engineer would comply with his duty and with the law by approaching under control, and coming to a full stop before he reached the crossing. "When a train approaches a crossing where its line intersects with the line of another railroad, and no train on that other line is approaching the crossing in dangerous proximity thereto—that is, so near and at such a rate of speed as to indicate either a purpose to cross without stopping or an inability to stop before reaching it—its engineer and conductor may presume that other trains approaching the crossing will comply with the law and stop before reaching the crossing, and may rely upon their doing so. This is a

well-settled principal of law." Vessel v. S. A. L. R. Co., 182 Ala. 589, 595, 62 So. 180, 182; Southern R. Co. v. Jones, 143 Ala. 328, 333, 39 So. 118.

[3-5] There is no merit in the suggestion that the intestate was not chargeable with the duty to stop for his crossing, unless defendants showed that it was not a crossing within the excepting clause of the statute (section 9953, Code 1923). Under such a statute the burden of proof is on the party who claims to be within the exception. Jefferson County v. Gulf Refining Co., 202 Ala. 510, 80 So. 798. Moreover, the testimony of plaintiff's witness Fidler showed that this crossing was not within the exception. And Giles had the right to presume, also, that an approaching train on the crossroad would not only stop, but would *not proceed* until it "knew the way to be clear." Code, §§ 9953, 5330; Southern R. Co. v. Bryan, 125 Ala. 297, 306, 28 So. 445. In the Bryan Case it was said that the engineer "must exercise not simply ordinary, but the highest degree of diligence to ascertain that the way is clear," and that the failure to stop the train and take in the situation before crossing would be "most culpable negligence." Had the evidence in any degree supported plaintiff's contention that Giles, or any other responsible servant on his train, *knew* that the intestate's train was lost in the fog, and that he was ignorant of the presence of the crossing and would therefore not stop, this would, of course, have rendered those several presumptions unavailable. But the evidence is without any tendency to support the view that any one of defendant's train crew had such knowledge. The mere fact of the existence of a heavy fog, restricting an engineer's vision from behind his headlight to about 90 feet, would not be the equivalent of such knowledge. In such a fog it was the duty of an engineer to be more than ordinarily careful, and to run his train at such a speed, and under such control, as to enable him to stop within the visible range of his headlight. Ala. Mid. R. Co. v. McGill, 121 Ala. 230, 25 So. 731, 77 Am. St. Rep. 52. Common prudence demanded such a precaution, and its omission was gross negligence. Western R. Co. of Ala. v. Mitchell, 148 Ala. 35, 44, 41 So. 427. The duty of an engineer under such conditions is imposed by law, and cannot be affected by the opinions of witnesses, expert or otherwise. Certainly Giles and the other trainmen were not culpable in presuming, the contrary never appearing, that the approaching engineer would observe common prudence, and would not be guilty of gross negligence in the operation of his train.

But it is strenuously insisted that the switchman, Mitchell, informed the fireman and engineer of defendant's train of the intestate's peril, in such manner as to call for preventive action by them, and in such time as to make it effective.

Observing, now, that defendants' train of 31 empty cars was in motion, at a speed of 4 miles or more an hour; that the engine was working steam; that the conductor, engineer, and fireman were seated in the engine cab, attending upon the movements of their own train; that, when Mitchell first became aware of the heedless approach of intestate's train, and "hollered" to the fireman, he (Mitchell) was half a car or a full car length from the engine; and that it does not appear how loudly he called, or that the enginemen *appeared* to hear him, or that any one *could have heard* him at that distance under those conditions—it cannot be inferred that the men in the engine did hear Mitchell, in the face of their clear and explicit denial.

[6] Moreover, Mitchell's words, "I think that man is going to cut us in two down there," even if heard, were but vaguely informatory of *some sort* of trouble, and by no means informed the enginemen that immediate preventive action of some sort was demanded of them to avoid it. Certainly such information was not the equivalent of *knowledge* that an engineer on the other railroad track was violating law and duty in driving his train over an occupied crossing without stopping before it was reached. Knowledge of peril, as an essential predicate for guilt of subsequent negligence, means *actual knowledge*, and not that imputed knowledge which is based upon information merely of facts which, if followed up, would result in actual knowledge. Anniston Electric & Gas Co. v. Rosen, 159 Ala. 195, 207, 48 So. 798, 133 Am. St. Rep. 32; Southern R. Co. v. Drake, 166 Ala. 540, 548, 549, 51 So. 996; Northern Ala. R. Co. v. Henson, 210 Ala. 356, 98 So. 18; Snyder v. Mobile L. & R. Co., 214 Ala. 310, 107 So. 451.

But, if it were conceded that defendants' enginemen heard Mitchell's warning cry, and were able to grasp its meaning, does the evidence permit a rational inference—anything better than a merely speculative guess— that they could have prevented the unhappy result by any means then within their power to use?

[7] The witness Mitchell made several statements about the dirt road crossing, viz. that, when he first saw the lights in the coach windows of intestate's train, it had about crossed the crossing, and also that it was somewhere up about the crossing. Assuming, as shown by the evidence, that the dirt road crossing was 1,000 to 1,320 feet east of this railroad crossing, and that intestate's train carried seven 60-foot long coaches, then, when it had gotten across the dirt road, the engine headlight would have been about 560 to 880 feet from the railroad crossing. But Mitchell testified that, although he saw the lights in the coaches, he could not and did not see *the headlight of the engine*. This shows conclusively that when he first noticed the coach lights—through the side windows,

of course—the engine had approached so near to the railroad crossing that its headlight was entirely out of his line of vision. At a distance of 560 or more feet from the crossing, had the witness been looking then, the headlight, many hundred times more powerful than the small coach lights, would of necessity have been visible to him at his post about 675 feet east of the crossing. These are physical facts which cannot be contradicted by any loose estimate by the witness of the position of the train with respect to the dirt road crossing behind it, and they conclusively confirm the substantial truth of his testimony that, when he saw the coach lights, the approaching train was within *90* or *100* feet of defendant's train on the crossing.

But he says that he at once *ran* towards the crossing and got as far as *two car lengths*, or 60 feet, before the collision. His speed could hardly have been less than 8 miles an hour, and the train, running at 25 miles an hour, or approximately 34 feet a second, would have run a little more than three times as fast as Mitchell, and would have gone, in the same time, about 200 feet, which would have required *not over six seconds*. If, then we accept these facts as showing that intestate's train was in fact 200 feet from the railroad crossing, instead of 100 feet, as specifically stated, it is clearly apparent that, after Mitchell had traversed 15 to 30 feet to the engine, and after the enginemen had received and understood his warning, and after the long whistle had been blown, and after he had applied his emergency brakes, it was too late to have materially lessened the speed of his engine before it reached the crossing. To assume such a thing is to assume what we are bound to know was physically impossible.

Our conclusion is that on the undisputed evidence, regardless of the rulings complained of, and regardless of the weight of newly discovered evidence, the several defendant corporations were clearly entitled to the general affirmative charge, as duly requested, and the errors, if any, committed by the trial court were not material, and cannot suffice for a reversal of the judgment.

[8] The same conclusion applies also to the case of the defendant Giles, unless an admission, alleged to have been made by him, and admitted in evidence against him alone, is sufficient to alter that result. W. K. McAdory testified that he was at the intestate's home just before his funeral, and saw the defendant Giles there on that occasion, and that Giles then stated that he "saw the reflection of Mr. Young's headlight coming, and reached up and caught hold of the whistle cord, and started to blow him down," and he said, "I don't know why I didn't do it." This falls very far short of any tendency to show an omission of duty by Giles *after* he had become aware that intestate's train was in actual peril of a collision with his own train at the crossing. So far, then, as the evidence before the court was concerned, Giles was entitled to the general affirmative charge; and the result would not have been different, had all debatable rulings on the evidence been in favor of the plaintiff.

[9, 10] But, in support of her motion for a new trial on the ground of newly discovered evidence, plaintiff presented the testimony of two witnesses that they were present with Giles at the home of the intestate just before his funeral. Both of them testified that Giles then stated that "he saw the Alabama Great Southern train approaching the crossing, and reached up to take hold of the whistle cord to blow him down, and did not know why he did not do so; and that, if he had done so, the accident would not have happened." One of them testified further that "Mr. Giles also stated that he could tell from the way the engine was puffing and working steam that Mr. Young was lost in the fog and did not know where he was."

This evidence was highly material and persuasive as against the defendant Giles, and was not cumulative merely. In her affidavit the plaintiff acquits herself of any want of care and diligence in discovering it and producing it at the trial. Fries v. Acme, etc., Works, 201 Ala. 613, 615, 79 So. 45. We think the motion for new trial should have been granted as to Giles, on the ground stated.

It results that the judgment will be affirmed as to the appellee Tennessee Coal, Iron & Railroad Company, Birmingham Southern Railroad Company, and Woodward Iron Company, and will be reversed as to the appellee Giles.

Affirmed in part, and reversed, rendered, and remanded in part.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.

On Rehearing.

SOMERVILLE, J. Counsel for appellant suggest that we are in error in granting plaintiff's motion for new trial as against the defendant Giles, and at the same time affirming its denial as to other defendants.

[11] At common law a judgment against two or more defendants jointly was regarded as an entirety, so that a reversal of the judgment as to one defendant required a reversal as to all. This rule, founded chiefly upon technical considerations, and now generally disfavored by the courts, has been recognized as existing in this state. Huckabee v. Nelson, 54 Ala. 12; Massey v. Oates, 143 Ala. 248, 39 So. 143; Lawrence v. Stone, 160 Ala. 382, 49 So. 376, 135 Am. St. Rep. 105; Sprague et ux. v. Daniels, 81 Ala. 444.

In later cases, while the general rule is not

denied, exceptions have been recognized, and the force of the old rule is now materially weakened. North Alabama Traction Co. et al. v. Hays, 184 Ala. 592, 64 So. 39; Southern R. Co. et al. v. Harris, 207 Ala. 534, 93 So. 470.

As noted in the text of 2 Ruling Case Law, 268, § 220:

"The tendency of modern decisions is, however, to modify the strictness of the common-law rule to the extent of holding that a judgment, though joint in form, is not necessarily entire, and that, where it is several in effect, and the adjudication as to one cannot affect the rights of the others, such judgment may be reversed as to some and affirmed as to others."

See Sparrow v. Bromage, 83 Conn. 27, 74 A. 1070, 27 L. R. A. (N. S.) 209, 19 Ann. Cas. 796, and note, 798.

[12] In the instant case the common-law rule as to the entirety of a joint judgment *against* two or more defendants is without any application, either technical or logical; and, not being committed thereto by any previous decision, we decline to extend the rule to judgments *in favor of* joint defendants, where the reason and justice of the case do not demand it. The only case in the books to the contrary is the old case of McDonald v. Wilkee, 13 Ill. 22, 54 Am. Dec. 423, where the court evidently confused judgments *for* with judgments *against* joint defendants, and illogically and heedlessly applied the same rule.

[13] But there is another difference here which must be noted. The question is not upon reversing the judgment proper, but upon the granting of a *new trial* as against one defendant because of newly discovered evidence admissible against him alone. In such cases it seems that the ancient common law has been denied by practically all of the courts, and joint verdicts in tort may be set aside as to one or more of the defendants, if justice so requires, and allowed to stand as to others. 20 R. C. L. 224, § 9; Sparrow v. Bromage, 83 Conn. 27, 74 A. 107, 27 L. R. A. (N. S.) 209, and note, 19 Ann. Cas. 796, and note, 797. To this view of the law this court gave full assent in the case of Pounds v. Richards, 21 Ala. 424, 426, where it was said, per Chilton, J.:

"We do not assent to the proposition asserted by the counsel for the plaintiff in error, that the court could not grant a new trial as to one party who was jointly sued, and refuse it as to another. In actions of tort, it is competent for the jury to find one of the parties guilty, and another not guilty. It may turn out also, that there may be no evidence conducing to show the guilt of one of the codefendants, while, as to the others, there may be a strong case made out. In all such cases, should the jury find a verdict of not guilty as to all, and the court should think a new trial ought to be granted, it would be doing great injustice to the innocent party, as against whom there was no evidence, to order a new trial as to him."

In a case like this, if it were conceded that a judgment *in favor of* two defendants is an entirety, the manifest result would be to deny a motion for new trial because of newly discovered evidence, unless the evidence would be admissible and effective against both defendants.

For the reasons stated, the application for rehearing will be overruled.

All the Justices concur.