256 So.2d 869

**SCOTCH LUMBER CO., a Co-partnership composed of William D. Harrigan, et al.**

v.

**Clarence C. BAUGH.**

**1 Div. 634.**

Supreme Court of Alabama.

Jan. 13, 1972.

Edward P. Turner, Jr., Chatom, Alton R. Brown, Jr., Mobile, for appellants.

**36**

Wyman O. Gilmore, Grove Hill, William L. Utsey, Butler, for appellee.

COLEMAN, Justice.

Defendants appeal from judgment for plaintiff in action for wrongful death of plaintiff's seventeen-year-old minor son.

There are three defendants. Two are partners who owned a tractor and trailer which will sometimes be referred to as the truck or log truck. The other defendant, Brooks, was driving the truck as an employee of the partners.

In Count 2, plaintiff alleges that his son was operating a motorcycle on U.S. Highway 43 where the highway intersects Chilton road, that plaintiff's son made a left turn off the highway into Chilton road, that defendant Brooks negligently drove the log truck over plaintiff's son, and, as a proximate consequence thereof, he died. In Count 1 plaintiff omits the allegation that his son was making a left turn and merely alleges that defendant Brooks negligently drove the truck over plaintiff's son.

Defendants pleaded the general issue and contributory negligence on the part of decedent.

The case was submitted to the jury on the two counts and defendants' pleas. Verdict and judgment were for plaintiff. The court overruled defendants' motion for new trial.

Defendants assign as error the refusal of affirmative charges requested in writing by defendants and the overruling of the motion for new trial.

It seems that Highway 43 is a paved black top road running approximately

north and south, and that "Chilton and Fulton" road is a gravel road running east and west. Plaintiff's son was operating a motor bike, sometimes referred to as a "motorcycle," traveling north on Highway 43. Roy Rutledge, who was a year older than decedent, was riding behind decedent on the motor bike.

Defendants' truck was loaded with tree length logs, was traveling east on Chilton road, and had stopped on the west side of the intersection as the motor bike approached. The truck moved forward not over eight or ten feet and stopped again when the passenger on the bike, Rutledge, gave a left turn signal.

Rutledge testified that he was traveling about "forty or forty-five" coming into "Fulton Junction"; that he gave the left signal; that they slowed down when they came into the intersection and started turning left; after "we got around the front of the truck" the bike started "kinda slipping"; there was gravel there; the truck was "up at the intersection"; "We went past the truck" and turned "in on Chilton road"; when the bike started slipping Rutledge "slid off and stepped off the bike" and "went on down the road a little bit to keep my balance"; he stopped "About ten or fifteen yards" from where the truck was; he does not know whether it was ten or fifteen yards or feet; when he stopped he was not looking at the motor bike; after he "looked back around" he saw that decedent was trying to keep the bike from falling over; it went up under the truck at the rear; after Rutledge stepped off the motor bike and stopped he was "Back, and out to the side a little piece" in relation to the cab of the truck; he was not still in Chilton road, he was off to the side of the road "About in the ditch" which was "Just a small one"; the truck was "on the other road" from the witness, and half of the width of the road separated him from the cab of the truck; he does not know how wide Chilton road is; he does not know whether the truck was moving when he stepped off the bike, he did not see it mov-

ing, he was not looking; he did not know the truck driver, he had just seen him around before; he spoke to the driver by waving at him; he does not know whether decedent waved at the driver.

Rutledge testified further that after he stepped off the bike, "I saw him going toward the back wheels of the truck" and "I didn't know that that was going to happen at that time, but after I seen that he had done gone up under the truck I started hollering to the driver"; after he saw that decedent "was going under the truck" the witness started hollering at the driver "By the time he had got up under it"; Rutledge testified that the truck was loaded with tree length logs; that the rear wheels of the trailer were sitting way back from the cab of the truck; that decedent went "up under the belly part of the logs, between the pull wheels and the trailer wheels back there"; that, when Rutledge started hollering, he could see the driver and that the driver, Brooks, did not turn around and look at the witness. The witness testified:

"Q When you hollered, you said he began to move or he was moving?

"A He was moving.

"Q Was it slow or at a fast rate?

"A. Slow.

"Q The wheels were just turning?

"A Yes."

Rutledge testified that the back wheels of the trailer passed over the bike, "Caught it about the middle"; when the witness first "saw he had gone under there and began to holler" decedent was "A couple of feet" from the wheels of the truck; that the wheels went over decedent's body; that the witness saw a pickup truck parked behind the log truck; that the man in the pickup told the witness that he was going to catch the log truck and stopped the log truck down the road.

Rutledge testified that the log truck was making a noise like a diesel; it was a loud

noise; that the witness was hollering as loud as he could.

On cross-examination, Rutledge testified:

"Q And as the bike got under the wheels and the truck was then moving forward, it was at that point that you started hollering, isn't that right?

"A Yes, sir.

". . . .

"Q All right, the wheel of the truck, with the truck moving, was a foot or two from the bike wheel at the time you hollered, 'Whoa', or 'Stop', or whatever you said?

"A No, I had seen it knocked down then I started hollering.

"Q You saw the truck wheel knock the bike and Junior down?

"A Yes, sir.

"Q Was the truck on the bike wheel or Junior at the time you first hollered?

"A Yes, sir."

The witness Autry testified that he arrived at the intersection between 4:30 and 5:30; Daryl Dunnagan was with the witness; the witness followed defendants' truck to the intersection; defendants' truck was loaded with tree length logs; the log truck was stopped or almost stopped; the witness stopped; the log truck stopped; he saw the bike come into view; it came from the south; it got on some gravel; it made a left turn off the highway; it passed in front of the log truck and turned left; the bike was traveling around ten or fifteen miles an hour; it was slowing up to make the turn; after he got in the turn, almost through the turn, he got on some loose gravel; it seemed to the witness when he gave it a little throttle to make it pull the rear spun out from under him on the loose gravel; "When it slid out from under him it got down in kinda a slide under the left

tandem of the trailer and slid in front of it"; as to the person on the back, about the time it spun out from under him he dropped his feet down and made a step or two to hold his balance and turned to the right and got off of the road and over almost in the ditch more or less; he could have been thirty to forty feet from the cab of the truck; the boy on the bike stayed on the motorcycle until he went under there; "About the same time the motor cycle went under it, the truck pulled on off over the motor cycle and the young fellow that was on it"; the man standing out to the side was screaming and hollering; the witness heard him; the witness was around maybe fifty or sixty feet from him; he started hollering before the truck got on decedent; when the boy started hollering, the truck was moving very slow; the truck could have stopped when the boy "went to hollering"; the witness was from twelve to twenty feet behind the logs that were on the truck; the window on the driver's side of the log truck was down when the witness stopped the log truck; the witness had to cross "Five" to get up beside the log truck; the witness blew his horn, he does not know whether "he" heard the horn; the witness could hear the log truck running, it was a diesel and any diesel will make a whole lot more racket than a gas one will; the boy was "flagging" up and down with his hands; he was standing "about a forty-five degree angle" from the cab of the truck; "that would be forty-five degrees behind the truck where the driver was sitting"; there is a black top apron there that extends onto Chilton road about eighty feet; the wheels of the trailer could have been back on this gravel, "I don't remember too much whether it was sitting on the gravel or on the pad"; the pickup of the witness would have definitely been back off of the black top apron.

Autry testified:

"Q All right, now then, at what point was it in relation to when Rutledge got off of the motor bike that Mr. Brooks started moving the truck?

"A I believe he was moving the truck, he started moving the truck about the same time, or maybe just a moment before the motor cycle slid under the trailer wheel. In other words, as the motor cycle slid under the trailer wheel, at the same time it slid under it, seems like to me the truck almost started moving ahead.

"Q In other words, the truck started moving and the motor bike went under the wheel about the same time, is that your testimony?

"A Or maybe the truck started a second or two before the bike went under it."

Autry testified that after Rutledge got off the bike, it was traveling very slow, just enough for it to slide up to the truck, about twenty or thirty feet it had to slide to get under the truck; the distance from the pull wheels of the truck to the trailer wheel was something like thirty to forty feet; when Rutledge started hollering the bike was on its left side sliding toward the trailer wheel; the bike was more or less up under the truck, the bike was headed straight down the side of the truck; after the bike got on its side the wheel was still spinning and that is what made him go under the trailer wheel. Autry testified:

"A The truck could have been stopped, but seems like to me it was moving forward as the motor cycle slid under it. If the truck had been stopped dead still as the motor cycle slid under it, the motor cycle wheel that was spinning would have kicked the motor cycle out from under the wheel if the truck was stopped still.

"Q It was a very short time after the Rutledge boy got off the motor bike until the motor bike started under the trailer wheel?

"A Right. It would have taken a few seconds because the motor cycle wheel pulled it under there slow.

"Q How many seconds?

"A Maybe thirty or forty seconds, because very little of the tire of the motor bike was under it."

Autry testified further that Rutledge was hollering before the bike went under the trailer wheel; the bike was around fifteen to thirty feet from the back trailer wheels when Rutledge started to holler; the witness is having to guess at it, he does not know the distance; it took the bike thirty seconds to travel fifteen or twenty feet; the truck started moving forward just a second or two before the motorcycle slid under the wheel; Autry was sitting there when he started hollering and was still hollering when Autry left there, roughly it could be from two to four minutes; the bike was traveling ten to fifteen miles an hour when Rutledge got off.

State trooper Norton testified that he investigated the accident, that there was a small rearview mirror of the type commonly used on a pickup truck, there is now a different type mirror on the trucks of the partnership; the decedent was just going too fast to make the turn into the intersection on the gravel and lost control of it; in the opinion of the witness, decedent was doing about fifteen miles an hour in the turn; the witness does not know what happened after he got in the turn; there was a lot of gravel on that road out there on the pavement; in the opinion of the witness fifteen miles an hour would be too fast to turn a curve on a motorcycle.

The witness Dunnagan testified that he was sitting behind the log truck and was in the pickup with Autry; Autry was driving; the bike started sliding when he started to turn, the boy on the rear got off and started running down the side, and the motorcycle turned over about a forty-five degree angle and went up under the trailer; the witness could not say whether the boy hollered before the motor bike went under the truck; the truck was traveling very slow at the time the bike went under the wheel; the witness could not see down the side of the truck; decedent got back in the sight of the witness when he came around

the truck; the bike started skidding when it got around in front of the truck; he first started making his turn when he got north of the truck, that is when he started skidding.

Defendant Brooks testified that the bike looked like it was perfectly under control when it passed the door of the truck, that he never did see the bike in trouble, that he never saw it go under the back wheel, that he never heard anyone yell to him immediately before he crossed the highway.

Plaintiff argues that defendants were negligent in that the log truck was not equipped with a proper mirror as required by Title 36, § 37, which requires that every motor vehicle shall be equipped with a mirror so located as to reflect to the driver a view of the highway at least 200 feet to the rear of the vehicle.

The defendant, Brooks, testified that the truck was equipped with a rearview mirror and that "you can see two hundred yards behind you anyway" in that mirror. We have found no testimony to the contrary.

Plaintiff contends that defendants were negligent in that the truck was not equipped with a proper muffler as required by Title 36, § 39. There is testimony that other trucks did not make half as much noise as defendants' truck, and that defendants' truck made a loud noise like a diesel. The testimony is insufficient to prove that the muffler was in violation of the statute.

As to the mirror and muffler, negligence on the part of defendants was not shown.

The driver of the truck did not do any act which caused decedent to go under the trailer. Decedent was operating the motor bike. His movement into a position in front of the trailer wheel was the result solely of his own actions. The conclusion is inescapable that decedent's own negligence placed him in front of the trailer wheel and proximately contributed to cause his death.

The only theory on which plaintiff can recover is that the truck driver discovered that decedent was in peril of a collision with the truck in time to have prevented the collision and nevertheless failed to use available means to prevent the collision; i. e., that the driver, after he was aware or had knowledge of decedent's peril, negligently failed to prevent the collision when he had means available to prevent the collision.

"It is well established in this jurisdiction that in order to predicate liability for subsequent negligence, the defendant must be shown to have had actual knowledge of the plaintiff in a perilous position, and thereafter negligently failed to use all the means at his command and known to skillful engineers, so circumstanced, to avert damage to the plaintiff, when to have promptly and duly used such means could have averted the accident. Young v. Woodward Iron Co., 216 Ala. 330, 113 So. 223; Wood v. Northern Alabama Ry. Co., 22 Ala.App. 513, 117 So. 495; Emmett v. Alabama Great So. Ry. Co., 226 Ala. 310, 146 So. 811; Beavers v. Southern Ry. Co., 212 Ala. 600, 103 So. 887.

"On the question of subsequent negligence as applied to railroad crossing accidents, our courts have stated the rule to be that it is the duty of an engineer, on perceiving any obstruction on the track, to promptly use all the means within the power of skillful and prudent engineers to bring the train to a stop. Hurt v. Southern Ry. Co., 205 Ala. 179, 87 So. 533.

"The engineer must have actual knowledge of the obstruction however. Such knowledge cannot be imputed to him because of circumstances from which the jury might infer that he had actual knowledge. Young v. Woodward Iron Co., 216 Ala. 330, 113 So. 223, and Wood v. Northern Alabama Ry. Co., 22 Ala.App. 513, 117 So. 495." Louisville &

N. R. Co. v. Griffin, 240 Ala. 213, 216, 198 So. 345, 347.

". . . . Knowledge of peril, as an essential predicate for guilt of subsequent negligence, means *actual knowledge,* and not that imputed knowledge which is based upon information merely of facts which, if followed up, would result in actual knowledge. Anniston Electric & Gas Co. v. Rosen, 159 Ala. 195, 207, 48 So. 798, 133 Am.St.Rep. 32; Southern R. Co. v. Drake, 166 Ala. 540, 548, 549, 51 So. 996; Northern Ala. R. Co. v. Henson, 210 Ala. 356, 98 So. 18; Snyder v. Mobile L. & R. Co., 214 Ala. 310, 107 So. 451." Young v. Woodward Iron Co., 216 Ala. 330, 334, 113 So. 223, 227.

See also: Daniels v. Carney, 148 Ala. 81, 42 So. 452; Central of Georgia R. Co. v. Bates, 225 Ala. 519, 144 So. 9; Griffith Freight Lines v. Benson, 234 Ala. 613, 176 So. 370; Johnston v. Southern Ry. Co., 236 Ala. 184, 181 So. 253; Honeycutt v. Birmingham Elec. Co., 236 Ala. 221, 181 So. 772; Hulsey v. Illinois Central R. Co., 242 Ala. 136, 5 So.2d 403.

Plaintiff argues that ". . . . notice of danger which is necessary to impose liability need not be actual. . . . . Therefore, it is submitted that the question of whether R. J. Brooks should have seen the motor bike sliding or should have heard the yelling of Roy Rutledge was for the jury to consider on the question of Appellant's negligence . . . . ." In support of this argument plaintiff cites Railway Express Co. v. Real, 253 Ala. 489, 45 So.2d 306, where plaintiff sued for injury to his finger caused when defendant's employee pulled an express truck against plaintiff's finger while he was holding onto a grab rail at an express car door. The opinion quotes at length from 45 C.J. 653, § 27, and 38 Am.J. 667, § 24, with respect to constructive or imputed knowledge or notice. The quotation from 45 C.J. is in that part of the text which relates to the Elements of Actionable Negligence. In the same volume, 45 C.J. at page 990, § 542, the following appears:

". . . . In some jurisdictions recovery is permitted only where defendant fails to exercise ordinary care to avoid the injury after becoming actually aware of the peril of the injured person or property. . . . ."

A number of Alabama cases are cited in support of the quoted statement. See also: 65A C.J.S. Negligence § 137(4)b, pp. 149, 150, and 57 Am.J.2d 815, Negligence, § 400. Railway Express Co. v. Real, supra, is not contrary to the doctrine that defendant's knowledge must be actual knowledge because in ¶ [4] the opinion recites:

"Moreover, the jury could have found from the evidence that Patterson had actual knowledge of plaintiff's presence in the mail car door. . . . ." 253 Ala. at 494, 45 So.2d at 310)

Plaintiff cites also Louisville & Nashville R. Co. v. Jenkins, 196 Ala. 136, 72 So. 68, where plaintiff was driving a mule to a buggy going south on a road west of and parallel to defendant's tracks when a train approached from the south, met the driver and mule in close proximity, " 'squirting' and puffing steam towards the road and mule, causing the mule to run away . . . . ." This court said: "The evidence showed that a man was on the west side of the engine, with his head out of the window, looking westward or nortwestward; that there was nothing to obstruct his view to where plaintiff and the frightened mule were." (196 Ala. at 139, 72 So. at 69)

The cases cited by plaintiff have been carefully examined. None of them is contrary to the holdings of this court that to predicate liability on subsequent negligence, the evidence must show that defendant had actual knowledge of plaintiff's peril.

The doctrine that defendant's knowledge must be actual and the reasons for so holding are discussed at length in Anniston Electric & Gas Co. v. Rosen, 159 Ala. 195,

48 So. 798.[1] See also: Nashville, Chattanooga & St. L. Ry. v. Vincent, 190 Ala. 91, 66 So. 697; and Young v. Woodward Iron Co., supra.

That the driver of a vehicle owes a duty to keep a lookout in the direction in which the vehicle is traveling appears to require no citation of authority. No authority has been cited or found, however, for the proposition that the driver of a truck and trailer loaded with tree length logs, which is lawfully stopped at a highway intersection, owes a duty to a passing motorcycle rider to look to the rear to ascertain whether the motorcycle has gone under the back trailer wheel when the truck started forward.

If, however, the circumstances be such that a duty is imposed on a truck driver stopped at an intersection to keep a lookout to his rear, his failure to look to the rear will not inform him of the motorcycle rider's peril. Such a breach of the driver's duty may be defended and defeated as a ground for recovery by the contributory negligence of the motorcycle rider in placing himself in peril under the trailer where injury might result to him from a breach by the truck driver of the duty to keep a lookout to the rear. Anniston Electric & Gas Co. v. Rosen, supra. In short, the driver's failure to look to the rear does not supply proof of his actual knowledge of decedent's peril, and the motorcycle rider's contributory negligence defeats recovery for the truck driver's negligent failure to look to his rear.

In the instant case, recovery on subsequent negligence must rest upon actual knowledge on the part of defendant Brooks that decedent was under the trailer or moving under it under circumstances reasonably indicating peril to decedent. This court has said that actual knowledge on the part of a person in charge of a locomotive that a plaintiff was on the track may be inferred from proof that at the time of, or immediately before the injury, the person in charge was looking down the track; and that the rule in this respect has been given like application to a motorman on street railways. Snyder v. Mobile L. & R. Co., 214 Ala. 310, 107 So. 451. The same principle would be applicable to a person driving a vehicle on a public road when such person was shown to be looking in the direction of the injured party and the view was not obstructed.

In the instant case, decedent was not in front of the log truck or the truck driver

---

I. " . . . . This knowledge has been otherwise referred to in the descriptive term 'aware,' meaning 'informed.' The requisite knowledge is of the fact that the party injured was in peril. Manifestly this condition (knowledge) to the duty (pretermitting wanton or willful misconduct, to be later considered) cannot arise out of a breach of duty to look out for persons, etc., in peril, whatever the place of injury. If the duty be to keep a dilligent (sic) lookout, and the duty be merely negligently breached, the consequence is the opposite of knowledge, namely, want of knowledge, and that, on this phase of the subject, attributable only to the failure to observe that course of conduct which would have probably led to knowledge. Sou. Ry. v. Bush, 122 Ala. 470, 26 So. 168. If a motorman, whose duty it is to keep a dilligent (sic) lookout for travelers, etc., on public streets traversed by his car, forsake his duty and engage in a diverting conversation with a passenger in his car, and a traveler, whose peril and inability to extricate himself therefrom would have been discovered by the operative, had he kept the lookout required, is injured, the proximate cause, aside from wanton or willful misconduct therefor must be ascribed, not to the stated condition of peril in which the traveler was placed, but to the operative's dereliction in not keeping the lookout prescribed. He did not know the peril stated, because he violated his duty to look. Such a breach of a duty, unless raised by the circumstances to the character of wrong commonly called 'wilfulness' or 'wantonness,' may be defended and defeated as ground for a recovery by the contributory negligence of the traveler, if attending his conduct, in failing to observe the care due from him (traveler) in placing himself in a position wherein injury to him might result from a breach by the operative of the duty to keep a dilligent (sic) lookout. . . . ." (159 Ala. at 203, 204, 48 So. at 801, 802)

when decedent moved into a position of peril but was to the rear of the truck driver. There is no testimony that the truck driver ever looked to his rear, and, on the contrary, the only testimony in this respect is to the effect that the truck driver did not look to his rear. Rutledge testified that, in relation to the cab of the truck, he was "Back, and out to the side a little piece"; that, in such position, Rutledge started hollering at the driver, and could see the driver, but the driver, Brooks, did not turn around and look at Rutledge. Brooks testified that he never saw the bike in trouble.

Plaintiff contends that because a diagram or drawing was used in examination of witnesses and the diagram is not in the record before this court, this court cannot review the question whether the trial court erred in refusing the affirmative charge or in overruling the motion for new trial.

The diagram was not introduced into evidence. As already stated, the evidence is clear that decedent did not come into a position of peril until he had passed to the rear of the cab of the truck where the driver was. As stated also, the evidence does not show that the driver ever looked to the rear. The question at issue is whether the evidence shows that the driver had actual knowledge of decedent's peril. The diagram would not show that the driver looked to the rear or had actual knowledge of decedent's peril, and absence of the diagram is not an obstacle to determination of the question at issue.

There is no evidence that Brooks ever manifested any knowledge or awareness of decedent's peril. The evidence is that he did not look backward where decedent was. To conclude that Brooks had actual knowledge of decedent's peril would, it seems, be the indulgence of pure conjecture or speculation. Until it be shown that Brooks had actual knowledge of decedent's peril, the doctrine of recovery for subsequent negligence has no operation to authorize recovery by plaintiff.

The burden is on plaintiff to show actual knowledge on the part of Brooks that decedent was in peril. Plaintiff has not carried that burden. Consequently, the court erred in refusing to give the affirmative charge for defendant.

Reversed and remanded.

HARWOOD, BLOODWORTH, and McCALL, JJ., concur.

HEFLIN, C. J., concurs in result.